Hello, I'm Deborah Pugh of the Office of the State Appellant Defender, and I represent the Appellant Frank Lee. Hi, my name is Ed Wazulski, and I represent the people of the State of Illinois. We have allotted 30 minutes for this case with the time being divided equally between the parties. The appellant can reserve some time for rebuttal if they'd like. We can be a little flexible because this is the only case on the call this morning. We have received your supplemental briefs. By way of suggestion, we don't need to spend much time on the supplemental briefs, but focus on the other issues, particularly the lesser-included offense issue. Okay? All right, you may proceed. Good morning, and I would like to reserve some time for rebuttal, please. Sure. I plan to talk briefly about the beyond reasonable doubt issue because it ties in so closely to the lesser-included offense issue.  Okay. So I'll discuss briefly the reasonable doubt issue before going into that. This is a sad case that involves injured animals, but the state didn't prove Frank Lee guilty of aggravated cruelty, and they didn't prove that he specifically intended to seriously injure or kill these animals. In fact, the state's case tracked the misdemeanor violation of owner's duty statute, but the jury was not instructed into that. So the state didn't prove him guilty of the crime for which he was charged, aggravated cruelty, and the jury wasn't instructed in the case, in the charge for which the case actually tracked. Well, the cases say that very rarely is intent proved directly. It's usually proved circumstantial, circumstantially, and isn't there enough circumstantial evidence here to show that the defendant perhaps owned the place or operated the place and somehow he nailed the doors to the stall closed and knowing that the horses can't open it enough to show circumstantially intent? Well, there are a few things there. One, there was evidence that Frank Lee owned the property, but that is not the same thing as owning everything that's on the property. We don't know whether these were stables that were rented out to various people. We don't know. So the state, there was a huge gap in terms of the evidence that was presented regarding Frank Lee's actual connection to the property. And I notice, Your Honor, that you used the word knowingly, and that is not the standard. The statute says intentionally, and there is a difference between what is knowing and what is intentional. Well, you nailed the door shut. That's an intentional act. But we don't know that Frank Lee nailed it. There is no evidence whatsoever in terms of the people who actually testified at the time. That's what I mean. It's circumstantial evidence. The circumstantial evidence, that is quite a leap going from this man owns this property to that, well, the doors are nailed shut, so therefore this man must have been the one to nail them shut and that he must have nailed them shut with the intent to seriously injure or kill these horses, these valuable horses. And there was just no evidence to connect him. There was no evidence that he was ever on the property during the entire time alleged in the indictment. The various people who testified testified that Frank Lee wasn't there, that they didn't, Raymond Struck of the Sheriff's Department said that he had no idea who was responsible for the horses. Anthony Estrada of the Animal Welfare League had no idea of Lee's involvement. He had no idea when Lee was last on the property. And most importantly, Anthony Estrada of the Animal Welfare League said that there were no signs of intentional injury, that nobody seemed to have intended to injure these horses. This is a case of neglect, not intentional injury. Well, we know that the defendant was on the property in July of 2007. Right. And we know that at that time he was made aware of rather deplorable conditions. Right. Okay, so we then know that about a year later, a year and two weeks later, the same and even worse conditions were present. Couldn't the jury infer from that that the defendant was on notice of really bad conditions, conditions that the government thought was bad enough that they gave him a citation, and then he walked away. Well, but again, we don't... couldn't it be said that you intended to allow those conditions to continue? I mean, for one, it's not clear that the conditions didn't improve briefly, or we don't know what happened. There was no follow-up following the July 2007 visit. And so we don't know what might have happened in the meantime, whether things improved. And, again, we don't know whose horses these are. We have no idea who owns these horses. We don't know who's responsible for it. There was another man on the property at the time that the Sheriff's Department was there. But there is no evidence that, frankly, was connected to these horses in any way. The state itself concedes that there is no... The horses were locked in a barn on a property that he owned. So I don't know if you can say that there's no connection. Well, there's connection to him and the property. But this is a rural property, and there was no evidence that he was ever on that property. We have no idea whether he was the one who was responsible for those horses or whether this is land that he owned and that things were going on on it, that he was renting out the spaces to other people who owned horses, that other people... I mean, we don't know. There was no evidence that he lived on the property. There's no evidence that anyone lived on the property. You don't think it's enough that he owned the property and that horses were locked for a long period of time? Would you agree with me that the evidence showed that they were locked in a barn? Oh, sure. Sure. Oh, yeah. I don't... Horses were locked in a barn in stalls that were too small for them. Manure piled up so high that it had become basically a cement block around their legs on his property. And you don't think there's any evidence suggesting that he could be responsible for that happening? Well, responsible is very different from specifically intending those horses to suffer those injuries. Even if he is responsible, and I don't concede that he was proved responsible where there was no evidence that he was responsible for these horses. He owned the land, yes. But that's very different from actually wanting this injury to happen. And this much more closely tracks the neglect of animal statute, the violation of owner's duty statute. And this is actually related to the ownership of the animal, not ownership of the property, which is what was proved here was ownership of the property. But there's... And when you compare this case to the other cases that involve aggravated cruelty statute, where there's a direct connection between the defendant and the animal at issue, and there's something that the defendant does to the animal at issue that shows a specific intent, this is sort of a big, hazy area. And I understand that something bad happened and that these horses were injured and that somebody should be blamed for this. But there was no specific intent to show that, frankly, he actually wanted this to happen. And so, for instance, in the other cases, there's Singleton, which is an easy case, which is where there was a burglary and somebody bashed a dog's head with a sledgehammer. Direct connection, clear intent. In Larson, a defendant shot his estranged wife's healthy, beloved dog, claiming it was euthanasia. And again, there was specific intent to cause harm directly to an animal. And the question is, is it euthanasia? Primbus is a sort of stranger case in that there's a lot of strange details in it. But basically, the defendant shot a dog that was on his mother's porch, and he made various stories that he didn't know exactly what the dog was. But the court didn't believe him at all and so found him, and so he was found guilty of specifically intending to shoot that dog. And then in Land, we have a case where the defendant was on the property with a dog that she owned. She knew this dog, direct connection between her and the dog, and she took the affirmative action of abusing the dog by placing this toe chain on it and then never removing this toe chain and, in fact, blaming it on a 12-year-old that this dog then suffered injuries that resulted in death. And all this... Well, I would agree that those cases stand for the proposition of certainly indicate  and the action or the conduct of the defendant. Are you suggesting to the court that unless and in the absence of the same in any case, we could never find intent? Oh, no, certainly not. It's definitely possible, but if there were some evidence that, frankly, was regularly on the property, if there were evidence that he was the one who nailed the stall shut, if there were evidence... There's just this blank area of what was going on on this property during the entire time in the indictment. We just don't know. But certainly a case of neglect could actually indicate an intention to cause harm to an animal. That is a case that I hate to imagine, but it's easy to imagine, where there would be a specific intent to result in that harm to an animal. But that wasn't proven here, where there was just no... The suggestion here is that merely because he owned the land, he was responsible for every bad thing that happened on that land, and we just don't know. There was just not enough evidence to show that he was the one who actually specifically intended the harm to these horses. Do you think there was enough evidence to show that the condition of the horses had been ongoing, these four horses, had been ongoing for a year? Oh, I'm certainly not going to contest any of the evidence that was presented by the experts in horses in terms of what the manure showed and that they would suggest that it was... And the damage to their hooves. Sure, yeah. Do you think that the jury could have found that those conditions had been present for a full year? I don't believe that the evidence showed or indicated that it was a full year. I think it was less than a year. The veterinarian said it could have been more than a year. Okay, okay. I think he said a couple of years. Okay, pardon me. I just couldn't remember exactly what they had said about it. I mean, the reason I'm saying that is, couldn't a jury have found from the evidence that these conditions were present in July of 2007, when Frank Lee was on the property? I see what you're saying. In any case, though, the idea that that shows that that kind of neglect shows specific intent to harm is still a jump, that intent to harm would be a conscious objective or purpose in causing harm to these animals. If you lock an animal in a stall, and you know that animal has no ability to feed itself, and you know you're not feeding it, isn't that an intentional act? Maybe you could refer to that as an omission, but the law doesn't make a distinction. No, the law doesn't make a distinction. So that could be an intentional omission, intentional deprivation. It could be in some cases, but here the evidence isn't there to really show that he was the one who did it, that he was the one who was responsible for the horses. He was on the property that day when the other crimes evidence was introduced to show his knowledge of the circumstances there, but that doesn't mean that he's the one responsible for it. And so should I be moving on now to the lessons from the previous instructions? And so in the alternative, should this court decide not to reverse outright based on the sufficiency of the evidence? This court should nevertheless reverse and remand for a new trial with lesser-included offense instructions. So here, although he was charged with aggravated cruelty, the evidence that the State presented really closely tracked the violation of owner's duties statute, which is a misdemeanor. And a lesser-included offense instruction is required where the indictment broadly describes the conduct required for the lesser-included offense, and any elements that are not specifically included can be inferred or implied. And also where the evidence could rationally support, where there's a slight evidence to support a conviction for the lesser offense and not the greater offense. And violation of owner's duties specifically requires that the owner of a companion animal fails to provide the animal with adequate food, water, shelter, and health care, whereas the aggravated cruelty statute requires only specific intent to seriously harm the animal. Do you concede that, frankly, he was the owner of these animals? No, I don't concede that he was. It seems possible that the jury could have made that inference, but I personally don't know, and there is no evidence presented that would suggest that he was the owner of these animals. But the indictment alleged that he, frankly, intentionally caused a companion animal to suffer serious injury or death, and that he, quote, failed to provide adequate food, water, shelter, and health care for the horses, resulting in serious injury. So he's basically charged as violation of owner's duties with the added elements of specific intent and serious injury.  But clearly nobody is required to provide water, food, and shelter, and so forth, for an animal that they neither own nor have taken affirmative responsibility for. And additionally, the state made sure that the jury was instructed as to the word owner, and so the state was really putting the notion of ownership before the jury. And throughout the trial and throughout the case, even on appeal, the state has really alleged that the aggravated cruelty charge is based on a violation of owner's duty. The state said to the judge, the indictment clearly states the act here, judge, is the defendant's failure to act, and then cited the owner's duty statute, not the aggravated cruelty statute. And in the state's brief on appeal, the state said that the defendant was guilty of aggravated cruelty. You have a, quote, defendant not taking care of the horses on his property. That is that he was guilty of aggravated cruelty because of the violation of owner's duty. It was the state's choice to charge it this way and to pursue the case this way, where it's a violation of owner's duty plus these two additional elements. And so the jury could have reasonably found that Bankley was guilty of violation of owner's duty but not found the specific intent element that was required for aggravated cruelty. There was slight evidence, it's a very low standard, slight evidence to require the lesser included offense instruction so that they could have had the jury consider that aspect of it too, whether he was guilty of a misdemeanor violation of owner's duty. And so there was just very slight evidence required for that, and as it was charged, it was the lesser included offense of the aggravated cruelty charge. And so for these reasons, we ask that this Court reverse on the lesser included offense issue and remand for a new trial or, in the alternative, reverse outright under the beyond reasonable doubt standard. Thank you. Thank you. Thank you, Mr. Judge. Thank you, Mr. Judge. Mr. Wazewski? May it please the Court, my name is Ed Wazewski. I'm the VF of the People of the City of Illinois. Defending defendant's conviction for the offense of aggravated cruelty should be affirmed by this Court. The evidence showed that on July 29, 2008, the main investigators in the Cook County Sheriff's Department went to the property that was owned by the defendant. Investigators found several horses there. The horses were in a barn that was boarded with nails. The horses were in poor health. There was no food or water available for them in the stalls. And the only hay that was available in the barn was moldy hay, which is insufficient to feed a horse. Counsel, can I ask you a question? The indictment gives a window of time that begins December 2007 and then it goes to July 29, 2008. I was unable to determine from the record why the State chose that window of time, December 2007. Your Honor, I do not know why they chose December 2007, but based on the evidence that was presented during trial, July 13, 2007 was four or five months to the indictment. And based on the prior act, the other crimes evidence, that was used to show the intent and identity and knowledge that the defendant was aware of these conditions. Going back to July 29, 2008, the horses were in stalls that were filled with manure that was up to their ankles. Four of the horses had to take to the vet, and two of them, as a result, were destroyed and taken out of their misery that day. The defendant wasn't found on the property that day, but on August 4, 2008, investigators from the Cook County Sheriff's Department were at the defendant's property. They waited for the defendant, and while they were waiting, the defendant pulled into his driveway, banked out, and immediately fled eastbound. The court in this case, this court should, it's to view the evidence in the light most favorable of the people, and this court should find it sufficient to sustain the defendant's conviction. If we accept the argument that the evidence was sufficient to support the conviction, if we look at it in the light most favorable, what do you have to say about the fact that the instruction of a lesser-included offense was rejected? As to the lesser-included offense instruction, rather, that should have been rejected, because as to the second prong in the charging instruments approach, no rational trier of fact would have acquitted on the aggravated cruelty offense and convicted on the violation of owner's duties, because the evidence here was so strong. You could tell by the conditions of the horses. You had one of the humane investigators testify as to the… But isn't that the jury's decision to make that choice? There's some difficulty reaching a verdict here. Well, one of the notes that came back, the first note was criminal serious injury, and that was as to the first horse, as to the final element, whether the horse was seriously injured. And if this court were to speculate as to the jury's findings, that's what this court could speculate to as to whether there was serious injury to horse one. The evidence is further shown to be sufficient based on the conditions of the horses. They were all very underweight. There were bones protruding. Their hooves were overgrown and deformed. They were extremely underweight based on the bones that were protruding. They had lost hair. One of the horses, horse three, he had lost hair. But, counsel, getting back to Justice House's question about the lesser included, I think everybody agrees that these were horrible conditions and that these horses had been badly neglected. I think defense counsel would admit that and did in the briefs. But wouldn't it have been reasonable for the jury? The jury came back with the conclusion that intent was shown here. Fair enough. But couldn't it have also looked at this case as just a case of complete neglect? And if that was what the jury found, if the jury didn't think, if the jury thought that these terrible conditions took place and it was, frankly, his responsibility, but he didn't intend for it to happen, couldn't they have convicted him of the owner's duty statute? No, Your Honor, because the intent here was inferred so strongly, not only from the conditions from when the defendant was fleeing from his resident on August 4, 2008. It was not in the testimony that he saw the sheriff's investigators, but it can be inferred that he saw the investigators. He's immediately backed out and went eastbound. Well, is he guilty of intentional or guilty of neglect? He was guilty of intentional. I mean the fleeing, you know, maybe he's fleeing because he's guilty of neglect. Well, he was fleeing because of his, because this, you could also consider the other kinds of evidence. The horses were in a similar state. They were underweight. The defendant was on the property that time, making him aware of the conditions. The defendant was, he was put on notice, and the other kinds of evidence that was also introduced to show his intent to commit this crime, and it showed that based on the conditions of the horses and the other kinds of evidence, and on this incident, that the defendant was on notice. If you don't feed a horse water or food and leave him in piles of manure, the natural consequence of that action is that they're going to die. Counsel, I don't think that anybody in the courtroom or certainly none of the justices or even the parties would disagree, as Justice Ellis indicated, that the conditions in which these animals were found was deplorable. It was horrible. How do you, or what is your response to defense counsel's argument with respect to the connectivity of the defendant to these particular acts? I understand the court understands that on the morning of the arrest, the defendant shows up on the property and, in fact, flees. What else? Oh, well, defendant, during the other crimes evidence, as defendant, you had two witnesses testify. The defendant said, get off my property. That shows his connection to the horses and other crimes and the horses here, because he was aware of the conditions of the property at that time. You also have the articles of incorporation that established the defendant to this property. He was one of the registered agents, or he was the registered agent. He was also one of the incorporators. The incorporation was called the borrow-out equitation, equitation out of the art or practice of riding horses. This goes further to show that the defendant was aware of these conditions. Well, let me ask you this. Just hypothetically, if an individual owns property and their horses own the property, but the individual is not directly responsible for the care of those horses, can that individual be charged with the intentional neglect if the person who is in charge does some intentional neglectful act? I mean, for example, there's a respondent. So the respondent's superior responsibility under the criminal code. Your Honor, they can be held guilty if they are responsible and aware of the conditions. It can't just be the owner. If there's someone else managing and taking care of the horses and the owner is not charged with that responsibility, can they be charged with intentionally? Well, if the owner was not responsible, then they should not have been convicted. But in this case, the defendant is responsible for these horses based on the proof of other crimes, evidence. And also, it could be inferred based on him fleeing from the scene. On August 4, 2008, he knew exactly what was found on July 29, 2008. That's why he left. And on July 13, 2007, approximately a year earlier, he was aware of the conditions then. So in this case, the defendant was responsible for the conditions. So accepting your argument that he was responsible, could have been charged, and could have been convicted, would that preclude then his entitlement to the lesser included offense instruction? Defendant was not entitled to the lesser included instruction because of the no rational trial fact would have acquitted him on the aggravated cruelty and then convicted him of the owner's duties violation. If there are no further questions, for these reasons and those stated in our brief, we ask you to affirm defendant's conviction. Thank you. Thanks. Ms. Pugh, a few minutes. I just have a couple of very quick things to say. I just want one key piece of evidence not to get lost here, which is that all of this obviously sort of pivots on the notion of specific intent, both the beyond a reasonable doubt argument and the lesser included offense. The main thing here is intent. And there's a key piece of evidence, which was Anthony Strada of the Animal Welfare League saying in his professional opinion, there is no sign of intentional injury for these horses. And so that piece of evidence is a key piece. That plus the lack of connection between the horses and Frank Lee goes to beyond a reasonable doubt. And that piece of evidence certainly goes to the lesser included offense instruction where there's only a slight bit of evidence. And there we have an expert saying there was no intention to harm an animal. That's the evidence that we have. Well, I assume he meant by that there were no scars on the animals. They hadn't been stricken. He certainly agreed that there was abject neglect. Right. No, you're correct. He's not a lawyer. He doesn't necessarily think of it in the same way that nomination would be an act. That's absolutely correct. But it is something for the jury to think about. The jury also are not lawyers. And they're thinking about what Anthony Strada said in the way that Anthony Strada meant it. And so that key piece of evidence is essential for the lesser included offense instruction. It's also very key for beyond a reasonable doubt. Quickly regarding fleeing, I think, Justice Howes, you already mentioned the idea that, yes, you might think, oh, no, I'm going to be charged with neglect. But also, if you were a property owner and you heard about this horrible thing happening on your property, I think any ordinary property owner would hurry out there and see, oh, my gosh, what is happening here. And then it's a human reaction to panic. If he panicked and saw police, oh, no, what's happening? And as a police officer said, he was very cooperative. And this is a former police officer himself who just realized, like, oh, no, I've got to stop here, and I'm going to turn myself into police. There was no evidence that fleeing had anything to do with it. And the officer who arrested him didn't call it fleeing. The corporation also does not show specific intent. In fact, those articles on corporation show that the corporation had been dissolved. They didn't actually show that the corporation was intact. And all the name bar L equitation indicates is that this is a piece of property with stables on it. It doesn't indicate that he had responsibility for these horses or certainly not that he specifically intended to injure them. And similarly, other crimes evidence also does not show he was responsible for the horses. It shows that he was on the property that day, that he had knowledge of deplorable conditions, but it doesn't show responsibility. So I just wanted to hit those quick remarks and, again, ask this Court to reverse outright on the issue of beyond a reasonable doubt or, in the alternative, to reverse and remand for a new trial with lesser-included defense instructions. Thank you. Thank you. All right. This is a very interesting case. Well argued and well briefed. This matter will be taken under advisement and a decision will be issued in due course. Thank you.